UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| JACKIE L. H.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 4:18-cv-00062-RLY-DML |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of the Social Security, | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## Report and Recommendation on Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C. §

636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its

appropriate disposition. As addressed below, the Magistrate Judge recommends

that the District Judge REVERSE AND REMAND the decision of the Commissioner

of the Social Security Administration that plaintiff Jackie H. is not disabled.

## Introduction

Jackie applied in March 2013 for Disability Insurance Benefits (DIB) under

Title II of the Social Security Act, alleging that she has been disabled since October

26, 2012. After a hearing, a final decision was issued finding that Jackie had

become disabled as of December 1, 2014 (when her age category changed under the

---

[1]    To protect privacy interests of claimants for Social Security benefits, the
Southern District of Indiana has chosen to use only the first name and last initial of
non-governmental parties in its Social Security judicial review opinions. The
plaintiff will therefore be referred to by her first name in this Report and
Recommendation.

"grids"), but she was not disabled between her alleged onset date and December 1, 2014. Jackie filed a complaint for judicial review of the non-favorable aspect of the decision and on joint motion by her and the Commissioner, the court reversed and remanded on March 27, 2017. The Appeals Council then issued its remand order (R. 466) on May 23, 2017, affirming the determination that Jackie was disabled as of December 1, 2014, but remanding as to the period before December 1. A new administrative hearing was held on November 14, 2017. On January 15, 2018, administrative law judge Belinda J. Brown issued her decision finding that Jackie was not disabled between October 26, 2012, and December 1, 2014. The Appeals Council denied review, rendering the ALJ's decision for the Commissioner final. Jackie timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

Jackie contends the Commissioner's decision must be reversed and remanded because the ALJ (1) did not properly evaluate the opinions of a consultative, examining physician, (2) made a patently wrong credibility determination, and (3) did not properly evaluate the severity of her gastrointestinal impairments.

The court will first describe the legal framework for analyzing disability claims and the court's standard of review and then address Jackie's specific assertions of error.

## **Standard for Proving Disability**

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Jackie is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then she is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her age, work experience, and education (which are not considered at step four), and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## **Standard for Review of the ALJ's Decision**

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but it does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of his reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

## I.    The ALJ's Sequential Findings

Jackie was born in 1959 and was 52 years old at the alleged onset of her disability in October 2012. She traces her onset date to when she was fired from her job as a machine operator (operating a lathe), a job that required constant standing. Jackie testified that her firing was due to excessive absences caused by her own health problems and the need to take care of her mother. (R. 426). She testified that she had begun having trouble lifting because of shoulder problems and pain, that her back and feet were hurting, and that stomach issues caused pain and required frequent and lengthy bathroom breaks. (R. 427-28).

At step one, the ALJ found that Jackie had not engaged in substantial gainful activity since her alleged onset date in October 2012. At step two, she determined that Jackie's severe impairments were mild facet hypertrophy[2] of the

---

[2]    "Facet hypertrophy is the term used to describe a degeneration and enlargement of the facet joints. The facet joints, which are a pair of small joints at each level along the back of the spine, are designed to provide support, stability,

lower lumbar spine, mild acromioclavicular changes of the right shoulder, midtarsal sprain of the left foot with residual pain, and obesity.  The ALJ decided that Jackie's gastrointestinal problems (chronic diarrhea, nausea, vomiting, and abdominal pain) were not severe.  She found at step three that no listings were met or medically equaled.

For the RFC, the ALJ decided that between her alleged onset date and December 1, 2014,  Jackie was capable of a range of light work "as defined in the regulations,"[3]  so long as she had a sit/stand option during which she could, throughout the work day, alternatively be on her feet at least 30 minutes at a time and then sit for 5 minutes.  She also imposed certain environmental restrictions and postural restrictions, including restricting Jackie to only occasionally reaching overhead with her right arm.  (R. 412).

Based on the testimony of a vocational expert, the ALJ found at step four that Jackie could not have performed her past relevant work, which required medium-level exertion. At step five, also based on the VE's testimony, the ALJ decided that Jackie had been capable of performing the work demands of the jobs of

---

and flexibility to the spine."  *See Spine-Health, Hypertrophic Facet Disease Definition,* https://www.spine-health.com/glossary/hypertrophic-facet-disease.

[3]    Light work requires the ability to engage in a "good deal of walking or standing," lifting no more than 20 pounds at a time, and frequently lifting or carrying items up to 10 pounds.  20 C.F.R. § 404.1567.  As explained in Social Security Regulation 83-10, because the ability to "frequently" lift and carry items requires "being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."

collator operator, router, and survey worker, and that these jobs existed in significant numbers in the national economy. Accordingly, the ALJ determined at step five that Jackie was not disabled between October 2012 and December 1, 2014.

## II.    Jackie's Assertions of Error

Jackie makes three arguments for remand. First, she contends that the ALJ did not properly evaluate the opinions of a consultative physician, Dr. Theodora Saddoris, who examined Jackie in May 2013 and in October 2013. Second, she contends that the ALJ's evaluation of her credibility was patently wrong. Third, she contends that the ALJ improperly evaluated the severity of her gastrointestinal impairments, a matter that is appropriately addressed in the context of the ALJ's credibility finding.

To evaluate Jackie's arguments, the court first outlines the evidence of Jackie's medical treatment and assessments and her testimony about her impairments and their effects on her functioning.

### A.  Jackie's Medical Treatment and Evaluation, Lack of Insurance, and Statements of Her Functional Abilities

The medical records show that Jackie was treated for a variety of issues in 2011 and the first half of 2012, but she had no medical visits or evaluations between her alleged onset date in October 2012 and December 1, 2014, except for one trip to the emergency room in May 2013, and the consultative examinations that were performed at the behest of the Social Security Administration after she filed her disability application in March 2013. As noted in more detail, *infra,* Jackie testified

that the lack of treatment was because of a lack of insurance after her job ended and her inability to pay for any office visits, diagnostic tests, or treatment.

Jackie saw an orthopedist in May, June, and August 2011 for treatment and evaluation of pain in her left foot. (R. 226-228). A sprain was suspected and when the pain did not subside, she was administered a cortisone injection. When, a month later, the pain remained, she was prescribed an opioid pain medication and x-rays were taken (R. 228), but no additional treatment for foot pain appears in the record. Jackie told her doctor in 2011 that she could not afford to purchase the arch supports that the doctor recommended. (R. 227-228). Jackie continued to complain about foot pain—now more in her right foot than the left—during her consultative examinations in May and October 2013.

In January 2012, Jackie complained of right shoulder pain that she attributed to a recent fall. An x-ray showed mild degenerative changes at the acromioclavicular joint, which is the joint at the top of the shoulder between the collarbone (clavicle) and the shoulder blade (scapula).[4] (R. 323). She was referred to an orthopedist, whom she saw in February 2012 because of continued pain in her right shoulder. Her range of motion in the shoulder was 70% of normal, testing indicated that the rotator cuff was impinged, and she was given a lidocaine injection. About a month later, the range of motion was at 60% of normal. She was diagnosed with tendonitis in the shoulder and referred to physical therapy to

---

[4]    For description of the acromioclavicular joint *see* https://hopkinsmedicine.org/health/conditions-and-diseases/ac-joint-problems.

increase her range of motion and decrease her discomfort.  Jackie had 12 physical

therapy visits and progressed well, increasing her range of motion and strength and

decreasing her pain.  Her therapy visits ended because Jackie felt she no longer

could afford to pay for physical therapy (her employer-provided insurance did not

cover all of the costs).[5]  Jackie was discharged to continue to perform her exercise

program at home.  (R. 269).  This was despite her doctor's approval of continued

physical therapy visits.  (*See* R. 238).

Jackie again sought treatment for her shoulder in May 2013, when she went

by ambulance to the emergency room because of shoulder and back pain.  Jackie

told the medical provider that she had had the shoulder pain for at least one year

but had not been able to afford any more treatment, including a recommended MRI,

because she had lost her job and her insurance.  The physician suspected a rotator

cuff tear in the supraspinatus tendon, told Jackie that an MRI was needed, and

urged her to call the Social Security office to obtain further evaluation and a

referral for an MRI.  (R. 357).  An MRI was not done, but the Social Security

Administration paid for x-rays of Jackie's shoulder and back,[6] which were done on

---

[5]     The record shows that even though Jackie steadily worked in manufacturing
for more than 25 years, she made only $13.27 per hour at the time of her
employment termination in October 2012.  (R. 156).  By March 2012, Jackie owed
about $550.00 for physical therapy (R. 254).

[6]     There is no information in the record about why the Agency's reviewing
physician did not order an MRI of the shoulder.  According to the Mayo Clinic's
website, a rotator cuff tear will not show up on an x-ray; either an ultrasound or
MRI must be done to reveal muscles and tendons in the body.  *See*
https://www.mayoclinic.org/diseases-conditions/rotator-cuff-injury/diagnosis-
treatment/drc-20350231. Moreover, the Agency's examining consultative physician
noted in May 2013 that an MRI had not been done to see if there was a tear of her

May 28, 2013. *See* R. 362-63, noting that the x-rays had been ordered by the Disability and Determination doctor; that doctor is an Agency reviewing physician. The shoulder x-ray showed mild AC joint degenerative change with spurring and the back x-ray revealed "very mild facet hypertrophy" in the lumbar spine. (R. 362-63).

In about April 2012, Jackie had several doctor visits because of gastrointestinal issues. She was experiencing frequent urination, blood in her stool, and pain in her stomach. The pain in her upper abdomen over the stomach area was affecting Jackie's ability to work because her job required repeated lifting of 50-pound bags. She was off work from mid-April through the end of May because of the pain and other gastrointestinal issues. An upper GI x-ray resulted in a diagnosis of moderate gastroesophageal reflux (GERD). Jackie's physician noted that the etiology of Jackie's symptoms was unclear, but he advised that Jackie's ingestion of aspirin might be one cause, and he recommended various tests. Those tests resulted in diagnoses of duodenitis,[7] gastritis,[8] retained gastric contents, hiatal hernia, and internal hemorrhoids. The duodenitis and gastritis were

---

rotator cuff. (R. 352). That same physician's October 2013 report stated that an MRI was warranted. (R. 377).

[7]     Duodenitis is inflammation of the duodenum, which is the first part of the small intestine and is located just below the stomach. *See* https://www.healthline.com/health/gastritis-duodenitis.

[8]     Gastritis is a general term describing inflammation of the lining of the stomach and "is most often the result of infection with the same bacterium that causes most stomach ulcers. Regular use of certain pain relievers . . . can contribute to gastritis." *See* https://www.mayoclinic.org/diseases-conditions/gastritis/symptoms-causes/syc-20355807.

assessed as mild and chronic.   (R. 315, 342).  In June 2012, Jackie underwent an

additional test, a gastric emptying study.  That study demonstrated "slow clearance

from the stomach" and "prolonged emptying of the stomach with the geometric half

emptying time of 114 minutes; normal is less than 90 minutes." (R. 347).  The slow

emptying of the stomach is a disorder called gastroparesis; when food stays in the

stomach too long, too much bacteria can grow.  *See*

https://www.saintlukeskc.org/health-library/gastroparesis.

The only other medical evaluation of Jackie's body systems was done by Dr.

Theodora Saddoris.  She conducted two consultative exams at the request of the

Social Security Administration, one on May 13, 2013, and the other on October 28,

2013.

Jackie testified that she had no other medical evaluations or treatment

because she did not have any health insurance between the time she was

terminated from her job in October 2012 and when she became eligible for Medicare

after being found disabled as of December 1, 2014.  In response to the ALJ's

question whether she "had had health care with the ACA" [Affordable Care Act]

before she became eligible for Medicare, she said no, but that she had tried to get

Medicaid and was turned down.  (R. 433).  Jackie also testified that she "tried to go

to these free clinics and if I was out of the county they wouldn't take me.  So, I went

to talk to somebody at Jennings County, there [were] no free clinics, you had to

[pay] like $60 or $40 copay, so I didn't even go look.  I went to the hospital, and this was after that."[9]  (R. 433).

Dr. Saddoris also documented Jackie's statements that she had not been able to afford treatment that had been recommended, including an MRI of her shoulder and appropriate medication to treat her pain and her stomach issues.  The doctor's May 2013 report notes that Jackie had been taking over-the-counter ibuprofen to treat her stomach problems and abdominal pain, but she had not been able to afford the prescription medications (Prilosec or Pentasa) that "would probably benefit her . . . to help reduce inflammation" in the stomach and abdomen.  (R. 352).  Further, her inability to take enough nonsteroidal medications also "made it difficult to fully treat the inflammation she has in her feet, shoulders, and back area." (*Id.*).  The doctor's October 2013 also reported that Jackie took aspirin to try to treat her pain, but aspirin exacerbated her stomach problems.  (R. 375).

Dr. Saddoris's reports of her two examinations include the medical history she took from Jackie, a description of her physical examination of Jackie's body systems, range of motion measurements, grip strength and fine and gross

---

[9]    The hospital reference is to Jackie's May 2013 emergency room visit where she complained of right shoulder and back pain.  She testified that the hospital "wouldn't do anything because I didn't have insurance" and "I'm still being sued for that, for the money that I owe for that."  (R. 433).  The record of Jackie's May 2013 emergency room visit reflects her lack of insurance, her statement that she had been unable to afford to see her regular doctor and could not afford to pay for an MRI, and the hospital's discussion with her to call either the Social Security office or Medicaid to try to speed up the process to get healthcare and a referral for an MRI of the shoulder.  (R. 356-57 and 359).

movement test results, and—at the end of each report—an "Assessment" of her

findings.  The Assessments include statements that:

(1) "The claimant is limited on how long she can sit, stand, and walk because of her back pain and also with her foot pain that she has."  (R. 353, May 2013 assessment) and

(2)  "The claimant is very limited on how long she can sit, stand, and walk because of discomfort [] [s]he has in her feet, legs, and her back.  Also, her shoulders and arms are limited in what she can do.  She can do decent grip strength and functioning, but I don't know with her limitation of her shoulders, how long she could maintain doing, stuff, especially being able to sit for very long or stand even less." N (R. 377, Oct. 2013 assessment).

Jackie testified at the administrative hearing that in the period after she lost

her job and before December 1, 2014, her physical abilities were quite limited.  She

testified that she could walk for only about 60 feet before the pain in her feet would

become severe enough that she would need to lean on something, that she could

stand for five or 10 minutes before pain in her back and feet would become severe

enough that she would need to sit down, that she could sit for 30 minutes or an hour

before she would need to get up and move around, and that she could not reach

overhead for things because of the pain in her right shoulder.  (R. 434, 435).  She

also testified that she was still suffering from gastrointestinal issues at the time.

(R. 434).

With this background in mind, the court now turns to Jackie's specific

assertions of error.  It addresses first her contention that the ALJ improperly

evaluated Dr. Saddoris's opinions.

## B. The ALJ's reasons for rejecting Dr. Saddoris's opinions are not supported by substantial evidence.

Agency regulations provide a list of factors to guide an ALJ's determination about the weight to give medical opinions, whether those of treating physicians, other acceptable medical sources, consultative examining physicians, or state agency reviewing physicians.  The factors are the degree to which an opinion (a) is supported by relevant evidence and explanations, (b) considered all pertinent evidence, (c) is consistent with the record as a whole, and (d) is supported or contradicted by other factors, such as the physician's understanding of SSA disability requirements.  20 C.F.R. § 404.1527(c)(3), (4), (6). The physician's field of specialty and the nature and extent of her treatment relationship with the claimant are also considered.  *Id.* §404.1527(c)(1), (2), and (5).[10]

As noted above, Dr. Saddoris opined in her Assessments that Jackie had limited abilities in sitting, standing, and walking.  Her May 2013 Assessment opined that Jackie "is limited on how long she can sit, stand, and walk" because of her back and foot pain.  (R. 353).  Her later October 2013 Assessment was more detailed and stated that (i) Jackie "is *very* limited in how long she can sit, stand, and walk because of discomfort" in her feet, legs, and back (emphasis added), (ii) her shoulders and arms are limited in what she can do, (iii) and with the shoulder limitation, "I don't know . . . how long she could maintain doing stuff, especially being [un]able to sit for very long or stand even less."  (R. 377).

---

[10]    The issue whether a medical opinion is entitled to controlling weight is not germane in this case because there is no medical opinion by a "treating physician."

The ALJ acknowledged that Dr. Saddoris's opinions, if credited, would at least prevent Jackie from performing light work (requiring a good deal of standing and walking for up to six hours of an 8-hour workday). (R. 410). But the ALJ determined that Dr. Saddoris's opinions had "little weight." She credited instead opinions of the reviewing physicians who opined that Jackie could perform light work. Her reasons for giving Dr. Saddoris's opinions little weight were that the doctor (a) "did not give any medical reasoning to support [her] statements," (b) the statements "appear founded mainly on the claimant's subjective complaints of pain rather than any objective findings," and (c) the statements are not supported by "the quite modest findings on the available imaging studies and medical exam" or by the fact that the claimant failed "to seek treatment or obtain insurance from available resources." (R. 410-11).

Jackie argues that the ALJ's reasons are, in the main, without support in or contradicted by the record. The court must agree. *See Beardsley v. Colvin,* 758 F.3d 834, 839 (7th Cir. 2014) (citation omitted) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.") Other than her observation that Dr. Saddoris's views are not supported by "the quite modest findings on the available imaging studies" (recall that the x-rays of the right shoulder showed "mild" degenerative change at the AC joint with spurring and the x-ray of the lumbar spine showed "mild facet hypertrophy"), the other reasons lack substantial evidentiary support. Three of the ALJ's statements are variations

on the same theme—that Dr. Saddoris's opinions are without any objective support because of alleged (i) modest findings on medical exam, (ii) lack of medical reasoning, and (iii) lack of "objective" findings. These reasons ignore, however, Dr. Saddoris's objective observations and objective testing, as detailed in her two reports, and the fact that she structured her reports to provide a medical assessment only after detailing Jackie's medical history (including treatment and results of imaging studies) and the doctor's medical examination findings. The ALJ's critique of the doctor's opinion also does not consider that Dr. Saddoris's two consultative examinations performed about five months apart and within the period under review by the ALJ are the only—and thus the best available—medical evidence in the record about Jackie's "top-to-bottom" physical condition during the period. She had *no* other examinations during this timeframe except for her one May 2013 visit to the emergency room.

Dr. Saddoris tested Jackie's muscle strength in her upper and lower extremities (arms and legs). She tested and observed Jackie's gait. She measured Jackie's range of motion in the cervical spine, lumbar spine, shoulders, elbows, wrists, knees, hips, and ankles. The May 2013 examination showed that Jackie's strength in her arms was only very slightly diminished—she had 4+/5 strength on the right but full 5/5 strength on the left; she also had normal 5/5 strength in her legs. By the time of the October 2013 examination, Jackie's strength had measurably decreased in all of these areas. Her strength was 4/5 in the arms and legs and her ankles also had 4/5 strength. For gait, Dr. Saddoris observed in May

2013 that Jackie had a wide-based and slow-paced walk that was slightly unsteady especially if she tried to walk on her toes or heels; Jackie was not able to tandem walk (heel-to-toe, straight-line walking). The only normal gait was Jackie's side-to-side walking, during which "she appeared to be reasonably stable without any assistive device." The results were similar during the October 2013 exam. Dr. Saddoris reported that Jackie's gait was slow and wide-based. She reported that Jackie could do only one step on her heels before she became "very off balance," could take only two tiny steps on her toes before she was off balance, and she was unable to tandem walk without holding on.

Range of motion testing showed dramatic decreases from May to October 2013. In May 2013, her range of motion was mostly normal except in 9 of 52 measured areas. Range of motion for neck extension was 30 degrees out of a normal range of 60 (or 30/60), lumbar flexion was 50/90, lumbar extension was 5/25, right shoulder abduction was 120/150, right shoulder adduction was 20/30, shoulder forward elevation was 100/150 on the right and 120/150 on the left, right hip internal rotation was 10/40, and right ankle dorsiflexion was 15/20. By October 2013, out of the 52 range of motion testing sites, Jackie had normal range of motion at only 10 of them (43 areas had been normal in May), and she showed below-normal, diminished range of motion throughout the lumbar spine, in both shoulders, in both knees, in all hip measurements (abduction, adduction, flexion, and internal and external rotation), and in both ankles.

Thus, the record simply does not support the ALJ's explanation that Dr. Saddoris's opinions were appropriately discounted because they allegedly lacked medical reasoning and any objective support, including examination findings.

The remaining reason the ALJ gave for discounting Dr. Saddoris's opinions is also belied by the record: that Jackie had unreasonably failed to obtain insurance from available resources to obtain appropriate treatment. (R. 411). Throughout her decision, the ALJ commented about Jackie's lack of treatment and Jackie's explanation (confirmed by medical records) that she lost her insurance when her job ended. In an effort to bolster the notion that the lack of treatment was because of the lack of sufficiently acute medical problems and not lack of funds, the ALJ stated that "the record shows no evidence that the claimant has explored all possible resources (e.g., indigent clinics, charities, or public assistance agencies) in order to obtain medical services" and there "is no evidence that she sought other available means of insurance, such as the federal government's Affordable Care Act." (R. 410). But the record is not silent about Jackie's efforts to obtain medical insurance, her efforts to find care she could afford, and her inability to pay for treatment.

As discussed, *supra,* even when Jackie had employer-provided health insurance, she consistently told medical providers that she was not able to afford recommended treatment not paid by insurance (*e.g.,* physical therapy fees that exceeded her insurance coverage and foot supports).[11]  And there is evidence—

---

[11]    Her professed inability to pay out-of-pocket costs seems consistent with the low wages (about $23,000/year gross) she earned while engaged in full-time work in a job for which she had over 25 years of experience.

Jackie's own testimony—that although she had not signed up for the Affordable Care Act,[12] she had applied for Medicaid and was turned down, she had gone to free clinics but was turned away because she did not live in the county, she could not afford other "free" clinics in her own county because they charged some fees for visits, and for the single time that she went to an emergency room for treatment, she had been sued for payment. The ALJ ignored this testimony.

In summary, the court finds that the ALJ's decision to reject Dr. Saddoris's opinions preventing Jackie from performing light work is not supported by substantial evidence and remand is required for that reason alone. For completeness, the court also addresses Jackie's other alleged errors.

### C. The ALJ's evaluation of the credibility of Jackie's descriptions of the limiting effects of her impairments is flawed.

Under SSR 16-3p, an ALJ is required to evaluate a claimant's subjective symptoms and their effects on his functioning in light of the relevant objective medical evidence, the consistency (or not) across time of the claimant's descriptions about her symptoms and their effects, the activities the claimant has engaged in and whether and how she may have structured her activities to minimize her symptoms to a tolerable level, and any other information such as about medications, precipitating and aggravating factors, and treatment that may shed light on the persuasiveness of the information the claimant provides.

---

[12]    There is no evidence about what the cost would have been for Jackie to have purchased a policy of health insurance offered on an ACA exchange (which was not even available until January 2014).

An ALJ's evaluation is entitled to special deference from the court unless it can be said to be "patently wrong." *Engstrand v. Colvin,* 788 F.3d 655, 660 (7th Cir. 2015). A court may find it patently wrong if the ALJ's determination is not "competently" explained or is grounded in reasons that are not supported by the record, *id.,* or are otherwise factually or logically mistaken. *Allord v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006). Further, when an ALJ's evaluation is particularly error-infected, remand is required because the court cannot determine whether the ALJ would otherwise have come to the same conclusion about the claimant's functional capacity and ability to work. *Id.* (a credibility determination is a judgment call and when the ALJ "based his judgment call on a variety of considerations but three of them were mistaken," the court cannot be sure that the same determination would be made had he not erred).

Here, the court cannot be sure the ALJ would reach the same evaluation about the reliability of Jackie's statements if she eliminated the errors in the current decision. Those errors include:

1. As discussed above, the ALJ did not accurately describe the record about Jackie's lack of insurance and her efforts to get treatment despite her lack of insurance. Moreover, the ALJ assumed—without any evidence—that Jackie would have been able to afford insurance coverage on an ACA exchange and then cited lack of ACA coverage as a reason to doubt the severity of her impairments, while failing to address Jackie's testimony about her efforts to obtain Medicaid and free care.

2. The ALJ relied heavily on the alleged lack of objective medical evidence to support Jackie's statements about her symptoms, but she did not accurately describe all

of that evidence or omitted discussion of evidence that could be viewed as corroborative of the symptoms.  For example, she stated that Dr. Saddoris had determined Jackie's gait was "essentially normal" and "reasonably steady," but Dr. Saddoris did not say that. Dr. Saddoris's May 2013 report described as "normal" and "reasonably stable without any assistive device" only Jackie's side-to-side walking.  Otherwise, according to Dr. Saddoris, Jackie's gait was slow, unsteady, wobbly, and unstable.  (*See* R. 352). The ALJ did not mention these latter descriptions. The ALJ did not address the significant deterioration in Jackie's strength and range of motion from May to October 2013, as documented in Dr. Saddoris's reports.  The ALJ stated that Jackie's right shoulder did not "regress" from the time she had physical therapy in early 2012, but that statement is not consistent with the May 2013 emergency room visit or with Dr. Saddoris's documented range of motion testing.

     3.     The ALJ discounted the severity—or even existence—of Jackie's gastrointestinal problems on grounds that are not supported by the record.  She did not acknowledge that objective medical tests had substantiated inflammation in her GI system and that the test of her body's stomach-emptying rate revealed conditions conducive to inflammation.  She found that Jackie's GI problems were "moot" because of Jackie's report to Dr. Saddoris that she gobbled up Rolaids, Alka-Seltzer, and aspirin to address the pain and symptoms, but then did not acknowledge the doctor's statement that this combination "may actually be aggravating the whole condition."  (R. 351).  She discounted Jackie's complaint about persistent diarrhea because, supposedly, Jackie would have had sustained weight loss if that were true.  There's no medical support in the ALJ's decision or in the record for that conclusion, and it may or may not be correct

as a matter of one's longitudinal physical condition—which is the only information the ALJ had available.

    4.    The ALJ did not evaluate how Jackie's daily living activities were consistent with the physical symptoms Jackie described as limiting her abilities.

    5.    The ALJ did not consider Jackie's especially strong work history—a matter even the VE commented about. *See Hill v. Colvin,* 807 F.3d 862, 868 (7th Cir. 2015) (claimant with solid work history is entitled to "substantial credibility").

    6.    And, finally, the ALJ's re-evaluation of the weight to give Dr. Saddoris's opinions may cause her to view Jackie's descriptions of the limiting effects of her impairments in a more favorable light.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge reverse and remand under sentence four of 42 U.S.C. 405(g) the Commissioner's decision that Jackie was not disabled before December 1, 2014.

Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Dated: August 14, 2019

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system